# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

UNITED STATES OF AMERICA,

        **Plaintiff**

-vs-                                       **Case No. 2:12-cr-92-FtM-29DNF**

ALAN JOHNSON
JENNIFER SPARKS,

        **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This cause is before the Court on the Defendant Jennifer A. Sparks' ("Sparks") Motion to Suppress Evidence (Doc. 25) filed on August 10, 2012. The Government filed a Response to Defendant's Motion to Suppress (Doc. 31) on August 24, 2012, and Sparks filed a Reply to Government's Response to Motion to Suppress (Doc. 32) on August 28, 2012. The Defendant, Alan Johnson ("Johnson") filed a Motion to Suppress (Doc. 38) on October 18, 2012. The Government filed a Response to Defendant's Motion to Suppress (Doc. 44) on November 1, 2012. Johnson filed a Motion to Suppress Statements (Doc. 39) on October 18, 2012, and the Government filed a Response to Defendant's Motion to Suppress Statements (Doc. 45) on November 1, 2012. An evidentiary hearing was held on December 17, 2012. The Government filed a Supplemental Memorandum of Law (Doc. 59) on December 20, 2012, Sparks filed a Supplemental Memorandum of Law (Doc. 60) on December 26, 2012, and on December 30, 2012, Johnson filed a Reply to Government's Supplemental Memorandum of Law in Response to Defendant Alan Johnson's Motion

to Suppress (Doc. 61). The Defendants are requesting that the Court suppress all evidence and statements obtained from the search of a cell phone and the search of the Defendants' residence on June 27, 2012. The facts concerning the Motions to Suppress are the same, therefore, Court will consider the Motions to Suppress together.

The Defendants are charged in an Indictment (Doc. 1). In Count One, the Defendants are charged with knowingly possessing one or more matters which contain a visual depiction which was produced using materials which have been mailed or shipped or transported in interstate or foreign commerce by any means where the visual depiction involved the use of a minor engaging in sexually explicit conduct and the visual depiction is of such conduct in violation of 18 U.S.C. §§2252(a)(4)(B), 2252(b)(2) and 2. In Count Two, the Defendants are charged with knowingly employing, enticing or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct and such visual depiction was produced using materials that were mailed, shipped or transported in interstate or foreign commerce but any means in violation of 18 U.S.C. §§2251(a), 2251(e) and 2. In Count Three, the Defendants are charged with employing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and such visual depiction was produced using materials that had been mailed, shipped, or transported interstate or foreign commerce by any means in violation of 18 U.S.C. §§2251(a), 2251(e) and 2.

**I. Evidence**

The Government presented the testimony of the following individuals: David Widner; Community Service Aide Classie Coleman, Fort Myers Police Department; Community Service Aide Sarah Gallegos, Fort Myers Police Department; Community Service Aide Amanda Janetzke, Fort

Myers Police Department; Brian O'Reilly, Detective/Sergeant Fort Myers Police Department; Patricia Enterline, Task Force Agent, Federal Bureau of Investigation; and Justin Spence, Task Force Agent, Federal Bureau of Investigation. The Government introduced into evidence Government Exhibit 1, a copy of the state search warrant and affidavit for the cellular phone; Government Exhibit 2a - e, photographs of the cellular phone; Government Exhibit 3a-c, photographs of pieces of paper located between the cellular phone and the protective case; Government Exhibit 4, a copy of the state search warrant and affidavit for Defendants' residence; Government Exhibit 5, a copy of the signed *Miranda* form; and, Government Exhibit 6a, a copy of Johnson's recorded statement.

Sparks testified on her own behalf. Johnson introduced into evidence Johnson's Exhibit C, an aerial depiction of 1114 3rd Way.

### A. Testimony of David Widner

Widner testified that his wife[1] found a cell phone at her work and she works at the Pine Island Wal-Mart. (Tr.[2] p. 10). His wife viewed the images on the cell found and found them to be questionable. (Tr. p. 7). He went to pick up the cell phone and viewed some of the images himself. (Tr. p. 7-8). When he saw the images, he knew immediately that he should turn the cell phone in to the police department. (Tr. p. 8). The images he saw were pictures of a young girl who was nude and posed in awkward positions, as well as other children. (Tr. p. 8). The young girl appeared to be four or five years old. (Tr. p. 8). He knew there was an album of pictures on the cell phone, roughly a

---

[1] Throughout the testimony of the witnesses, Linda Vo, the wife of Widner is referred to as his "wife," "girlfriend," or "fiancé" depending on the speaker.

[2] "Tr." refers to the Transcript (Doc. 62) of the evidentiary hearing held on December 13, 2012.

thousand images. (Tr. p. 8). His wife said that there was a video on the cell phone but he did not see the video, he only viewed the still images. (Tr. p. 8).

He had no contact with the owner of the cell phone. (Tr. p. 9). However, his wife called the owner of the cell phone, and after the call, she looked at the images on the cell phone to determine what the owner looked like. (Tr. p. 9). When trying to find a photograph of the owner of the cell phone, the wife saw the questionable images. (Tr. p. 9). After viewing the images on the cell phone, Widner took the cell phone to the police station. (Tr. p. 9). He took the cell phone to the Fort Myers Police Department, because he did not know where the Cape Coral Police Department was located. (Tr. p. 9-10).

At the Fort Myers Police Department on June 4, 2012, Widner told the personnel that he wanted to file a report about images he found on a cell phone. (Tr. p. 11). He showed the Fort Myers Police Department personnel the cell phone. (Tr. p. 11-12). He told the personnel that his wife found the cell phone and described the images of the nude child found on the cell phone, and told them that there were several such images on the cell phone. (Tr. p. 12). When he attempted to show the personnel the images on the cell phone, the phone died. (Tr. p. 12). He ran to his car and got a cell phone charger that worked on the found cell phone. (Tr. p. 12-13). He spoke with the person at the front desk and two other officers who took his information. (Tr. p. 13-14). The two officers asked to contact his wife concerning the cell phone. (Tr. p. 14). They called her from his cell phone. (Tr. p. 14). He told the officers that the images were located in one of the photo albums. (Tr. p. 15). He remembered showing one image to the officers there of the same young girl in the back seat of a car. (Tr. p. 16). He was able to scroll through the cell phone and look at that image and show it to someone at the Fort Myers Police Department. (Tr. p. 16).

On cross examination by counsel for Johnson, Widner testified he believed he came in contact with the cell phone on June 4, 2012, the same day his wife found the phone. (Tr. p. 17).  His wife had texted him  about finding the cell phone and the images on it. (Tr. p. 17).  His wife showed him the images on the cell phone when he went to her work. (Tr. p. 17, 18).  He told his wife he was taking the cell phone to the police department to turn it in. (Tr. p. 18). He viewed maybe two or three images, but saw more than one album of images and his wife told him that there were many more images.  (Tr, p. 18-19).  He does not know how many images his wife viewed.  (Tr. p. 19).  Widner was not able to see the images the officers at the Fort Myers Police Department viewed on the cell phone, and did not know if the officers viewed the same images he saw.  (Tr. p. 20).   Widner told the personnel at the Fort Myers Police Department that his wife had contact with the female owner of the cell phone, who asked that the cell phone be returned. (Tr. p. 21, 22).   Arrangements had been made to pick up the cell phone by the female owner, but then his wife viewed the images on the cell phone, and Widner determined that the cell phone had to be taken to the police.  (Tr. p. 22-23).

On cross examination by counsel for Sparks, Widner testified that he viewed two or three images on the cell phone. (Tr. p. 25). The girl in the photograph sitting in the back seat of a car was fully clothed. (Tr. p. 25-26).  One of the other images was of a young girl, most likely the same four to five year old lying nude on a bed, and in another photograph there were three young girls all naked that looked like they were posed awkwardly, and Widner believed these photographs were sexually suggestive. (Tr. p. 27-29).

The Court asked Widner if he had viewed any of the photographs with the officers and he replied he had not. (Tr. p. 31).   The officers took the cell phone and looked at the images themselves. (Tr. p. 31).  The Court later asked Widner to clarify whether he had viewed at least one image on the

cell phone with someone at the Fort Myers Police Department, and Widner stated that he had viewed one image with an officer. (Tr. p. 34-45).   That one image was of a child sitting in the back seat of a car. (Tr. p. 35).

On redirect examination, Widner testified that when he was at the Fort Myers Police Department, he had scrolled down the images on the cell phone and showed one of the images to someone from the Police Department. (Tr. p. 32).  Widner scrolled through the phone enough to know that there were images on the phone in the two different albums.  (Tr. p. 33). His wife had scrolled through images with him and he saw the thumbnails of the images, but did not recall them specifically. (Tr. p. 34).  His wife scrolled through the images with Widner and told him that the photographs were getting "worse" as she continued to scroll.  (Tr. p. 34). Widner left the cell phone with the Fort Myers Police Department.  (Tr. p. 34).

### B.  Testimony of CSA Classie Coleman

Coleman is employed by the City of Fort Myers Police Department as a Community Service Aide. (Tr. p. 36-37).   Her job duties include helping with passive crimes to relieve the officers in the field of these duties.  (Tr. p. 37).   She was working at the front lobby of the Fort Myers Police Department on June 4, 2012 when a man (later identified as Widner) brought a found cell phone to her that he wanted to turn it in to the police. (Tr. p. 37).  He told her that someone called on that cell phone to try to get their cell phone returned.  (Tr. p. 38).  Widner told her that he found the cell phone in a shopping cart in the parking lot at Walmart.  (Tr. p. 38).  Widner said that there were some very pornographic images of little kids on the cell phone. (Tr. p. 38).  When he passed the cell phone to her to attempt to show her a photograph on the cell phone, the cell phone went dead.  (Tr. p. 39).  Widner

went to his car to obtain a charger. (Tr. p. 39).  She plugged the charger into the cell phone. (Tr. p. 39).

Widner told her that there were over 200 disturbing images of children on the cell phone, which was

why he was turning the cell phone in to law enforcement. (Tr. p. 40).

Community Service Aid Sarah Gallegos came to the lobby because Coleman was working the

front desk.  (Tr. p. 40).  Coleman asked Gallegos to make contact with the supervisor to let him know

about the cell phone, and to give direction as to how to proceed. (Tr. p. 40).  Gallegos went to find a

supervisor. (Tr. p. 40).  Widner wrote his name and his girlfriend's name on a piece of paper for

Coleman. (Tr. p. 40-41).  He told Coleman that his girlfriend found the phone.  (Tr. p. 41).  Coleman

said that she saw a woman, who was with Widner, walk out of the police station so Widner provided

both of their names and phone numbers. (Tr. p. 41).  Widner volunteered to show Coleman the images

on the phone.  (Tr. p. 41).  Coleman saw a few images when her supervisor was scrolling through the

cell phone. (Tr. p. 42).   Coleman's normal procedure with found cell phones is to put them in the

found property vault. (Tr. p. 41-42).   Widner told her that the owner was texting to the cell phone to

try to retrieve it, and he had the name of the person.  (Tr. p. 41-42).  Coleman did not ask for or

receive the name of the possible owner. (Tr. p. 43).   The cell phone was not returned Widner. (Tr. p.

43).

On cross examination by counsel for Johnson, Coleman testified that Widner was accompanied

to the station by a woman. (Tr. p. 44). The woman left the station and went outside. (Tr. p. 44).  Sgt.

O'Reilly came to the booth area with Coleman while Widner remained in the lobby.  (Tr. p. 46). Sgt.

O'Reilly did not have contact with Widner. (Tr. p. 46).  Gallegos did go into the lobby and questioned

Widner. (Tr. p. 46).   Coleman saw Sgt. O'Reilly scroll through the images on the cell phone. (Tr. p.

46-47).  Gallegos was looking at the images on the cell phone as Sgt. O'Reilly scrolled through them,

but Widner was not in the vicinity of the cell phone. (Tr. p. 47-48).  The decision to investigate the owner of a cell  phone and the decision to return a found cell phone to its owner is made by the investigating officers not Coleman.  (Tr. p. 49).

On cross examination by counsel for Sparks, Coleman testified that when some item is found, it is the procedure to log it in, and then place the item in the found property vault. (Tr. p. 50).  Widner told her that he had received some text messages from the owner of the cell phone and knew the owner's name.  (Tr. p. 51).  Coleman never asked him to show her the text messages or to provide the name of the owner of the cell phone.  (tr. p. 51). When Sgt. O'Reilly was scrolling through the cell phone, Coleman saw five or six disturbing images on the cell phone, and thereafter, refused to continue viewing the images. (Tr. p. 52).  Coleman had asked Widner what was so disturbing about the photographs and he responded that there were hundreds of pornographic photographs of small children which included nude photographs of children. (Tr. p. 52-53).

On redirect examination, Coleman testified that she did not know of anyone who came to the Fort Myers Police Department to retrieve the cell phone.  (Tr. p. 57).   Widner did receive a text on the found cell phone while he was in the lobby of the police department. (Tr. p. 57).


### C.  Testimony of CSA Sarah Gallegos

Gallegos is employed as a Community Service Aide at the Fort Myers Police Department.  (Tr. p. 61). She was working on June 4, 2012. (Tr. p. 61).  She met with a man (later identified as Widner) bringing in a found cell phone in the lobby of the Fort Myers Police Department. (Tr. p. 61). Coleman told her about the cell phone. (Tr. p. 61). A trainee Community Service Aide Amanda Janetzke was with her as well. (Tr. p. 62).  Gallegos asked Widner to explain what he found on the

cell phone. (Tr. p. 62).   Widner decided to show her. (Tr. p. 62).   Widner told Gallegos that he found

the cell phone at Walmart in Cape Coral, and that it contained disturbing images of children including

children being molested and there was a photograph of the person who possibly may have done it.

(Tr. p. 62-62).   Widner wanted to show her the images.  (Tr. p. 63). After the phone charged for a

while, Widner turned on the phone and showed Gallegos and Janetzke how the cell phone worked.

(Tr. p. 63).   Widner showed her images of children and an adult with exposed private parts.  (Tr. p.

63).   There were also text messages on the cell phone from the possible owner who Widner believed

his name was Alan, and text messages from a woman as well. (Tr. p. 64).   Gallegos had Widner call

his girlfriend who was the person who found the cell phone, to get further information. (Tr. p. 65).

Widner and his wife only knew first names for the possible owners of the cell phone. (Tr. p. 64, 66).

After viewing the images on the cell phone, Gallegos contacted a lieutenant and the on-duty sergeant,

Sgt. O'Reilly. (Tr. p. 66-67).   Gallegos was shown hundreds of images on the cell phone. (Tr. p. 67).

Widner would scroll through and would stop on a few images. (Tr. p. 67).   The cell phone was not

returned to Widner.  (Tr. p. 67).   Gallegos told Sgt. O'Reilly what she had observed on the cell phone

and told him what Widner had told her. (Tr. p. 68).   She viewed the images on the cell phone for

approximately five minutes. (Tr. p. 69).   Sgt. O'Reilly viewed the same area on the cell phone that she

had. (Tr. p. 69).   Sgt. O'Reilly only looked at the cell phone for a couple of minutes. (Tr. p. 69).

On cross-examination by counsel for Johnson, Gallegos testified that she viewed the images

with Widner in the lobby and with Sgt. O'Reilly in the booth area. (Tr. p. 71).   Widner showed her

numerous images on the cell phone. (Tr. p. 72-73).   Neither Gallegos nor Sgt. O'Reilly attempted to

obtain a search warrant for the cell phone.  (Tr. p. 75).   On cross-examination by counsel for Sparks,

Gallegos testified that Widner showed her hundreds of images as he scrolled through the images on

the cell phone, and then Widner did stop at a few images. (Tr. p. 76).  Gallegos did not attempt to text the possible owners of the cell phone. (Tr. p. 80).

### D.  Testimony of CSA Amanda Janetzke

Janetzke testified that she is a Community Service Aide for the Fort Myers Police Department. (Tr. p. 83).  On June 4, 2012, Janetzke was in training with Gallegos. (Tr. p. 83).  She and Gallegos met with Widner in the lobby of the police department. (Tr. p. 84).  Widner explained the situation and she, Gallegos, and Widner viewed images on the cell phone. (Tr. p. 84).  Widner told them that there were explicit photographs of children in inappropriate sexual poses.  (Tr. p. 85).  Widner scrolled down the images on the cell phone to the bottom where there were photos of a little girl inappropriately posed. (Tr. p. 85). Widner would stop at some images as he scrolled down. (Tr. p. 86). There were hundreds of images on the cell phone. (Tr. p. 86).  Widner appeared to have certain images in mind that he wanted to find and show Janetzke and Gallegos. (Tr. p. 86).   Once Janetzke or Gallegos determined that the situation was serious, their procedure is to contact a supervisor, in this case Sgt. O'Reilly. (Tr. p. 87-88).   Widner told Gallegos and Janetzke that texts were coming to the cell phone with a first name only and the text indicated that the sender wanted the cell phone back. (Tr. p. 88).   Neither Widner nor his wife had the full name of the owner of the cell phone. (Tr. p. 88). The cell phone was not returned to Widner. (Tr. p. 89).

On cross examination by counsel for Johnson, Janetzke testified that she told Sgt. O'Reilly about the images on the cell phone but could not recall if she was present when he viewed them. (Tr. p. 90-91).  Widner showed Gallegos and Janetzke the images and at some point Gallegos took the phone to view the images. (Tr. p. 94, 97).  The three of them viewed the images for approximately five

to ten minutes. (Tr. p. 97).  She viewed approximately ten images. (Tr. p. 97).  There was a thumbnail of the photos, but to see the full photo, Widner had to click on it.  (Tr. p. 97).

### E.  Testimony of Sergeant Brian O'Reilly

Sgt. O'Reilly testified that he is employed by the City of Fort Myers Police Department as a detective sergeant and was working on June 4, 2012. (Tr, p. 105-106).  He was notified by Gallegos that a cell phone was dropped off at the police department and the cell phone contained inappropriate images of a pornographic nature involving children. (Tr. p. 106).  He proceeded to the booth where the cell phone was located and spoke with Gallegos. (Tr. p. 106).  Gallegos handed the cell phone to him. (Tr. p. 107).   Gallegos told him that the cell phone was found at a Walmart by Linda Vo, and her fiancé Widner brought the cell phone to the police department to turn it in. (Tr. p. 107).Widner had left the lobby before Sgt. O'Reilly reached the booth. (Tr. p. 114).   Sgt. O'Reilly never spoke to Widner.  (Tr. p. 114).   Sgt. O'Reilly wanted to verify the images on the cell phone were in fact child pornography so he examined the images on the cell phone. (Tr. p. 108).   When he received the cell phone, he turned it on and then began to scroll through the images.  (Tr. p. 115). He did not look at any other area of the cell phone. (Tr. p. 108).   He viewed the images for approximately one minute. (Tr. p. 108).   He did not have any information concerning the owner of the cell phone. (Tr. p. 108).  He observed several images of male genitalia, he saw that there were two videos and viewed them briefly, and then saw other images that were progressively more suggestive of children. (Tr. p. 109).  He only looked at the images on the cell phone, and did not look at any other folder or anywhere else on the phone. (Tr. p. 108, 110).   Once he saw images that he considered to be child pornography, he turned the cell phone off, submitted the cell phone in to evidence, and contacted the Cape Coral Police

Department. (Tr. p. 110).   He instructed Gallegos to prepare an offense report document so that he could take this document and the cell phone to the Cape Coral Police Department. (Tr. p. 111).   On June 5, 2012, he logged the cell phone out of evidence, and he delivered it to the Cape Coral Police Department. (Tr. p. 111).   He identified the cell phone as depicted in Government Exhibits 2A and 2B.  (Tr. p. 112).   He informed the Cape Coral Police Department that the cell phone was recovered at a Walmart in Cape Coral and that it contained child pornography images, and then turned the cell phone over to the station officer who was going to submit it into evidence and have the detective sergeant assign the case.  (Tr. p. 113).  Sgt. O'Reilly provided no information as to the owner of the cell phone.  (Tr. p. 113).

On cross examination by counsel for Johnson, Sgt. O'Reilly testified that he had no contact with Widner. (Tr. p. 115). Gallegos did not point out any specific images on the cell phone to him. (Tr. p. 115). No search warrant was obtained by Sgt. O'Reilly for the cell phone.  (Tr. p. 116).  Once he viewed what he considered to be child pornography, he stopped viewing images.  (Tr. p. 16).  He recalled seeing three images of child pornography on the cell phone.  (Tr. p. 116-117).   On approximately June 27, 2012, he was contacted by a law enforcement officer, Task Force Agent Enterline  regarding the cell phone.  (Tr. p. 117).  Sgt. O'Reilly described the images that he saw on the cell phone to Agent Enterline.  (Tr. p. 118).

On cross examination by counsel for Sparks, Sgt. O'Reilly testified that he was made aware that in Gallegos' opinion, the cell phone contained child pornography, but he wanted to have a more independent validation that there was in fact child pornography on the cell phone. (Tr. p. 119). Gallegos and Widner are both civilians, and he wanted to verify that the images were illegal.  (Tr. p. 119).   He was told that a female, not the owner of the cell phone, did text that she wanted the cell

phone returned. (Tr. p. 120). He did not examine the texts nor did he respond or send texts to this female. (Tr. p. 120-121). He only watched each video for a short period of time. (Tr. p. 123). He would not have returned the cell phone to its owner after viewing the images it contained. (Tr. p. 124).

### F.  Task Force Agent Patricia Enterline

Agent Enterline is employed by the Cape Coral Police Department and is assigned to the Federal Bureau of Investigation's ("FBI") Innocent Images Task Force. (Tr. p. 126). On June 7, 2012, Agent Enterline was at the airport leaving for training classes that were to last three weeks when her sergeant called her to say that he had received a case that may or may not involve child pornography relating to a cell phone. (Tr. p. 127). She was told it was "no big deal" and that she could review the case when she returned from her training. (Tr. p. 127). Her sergeant's understanding was that someone had found the cell phone at a Walmart in Cape Coral and turned it in to the Fort Myers Police Department, and someone from the Fort Myers Police Department delivered it to the Cape Coral Police Department. (Tr. p. 128). Her understanding was the cell phone was not seized by law enforcement, but rather found and turned in to the police. (Tr. p. 128). She had no information as to the owner of the cell phone. (Tr. p. 128).

On June 19, 2012, she returned from one of her trainings, retrieved the evidence from the Cape Coral Police Department, and then transferred it to the FBI so she could obtain a search warrant. (Tr. p. 128-129). She opened the package so that she could get the serial number for the cell phone. (Tr. p. 130). Agent Enterline identified the cell phone and the serial number from the backing that she removed. (Tr. p. Tr. p. 131, and Gov. Exh. 2C, D, and E). When she opened the evidence bag she was looking for a description of the phone and the serial number. (Tr. p. 131). She had to open the

evidence package and remove the protective case of the cell phone to obtain this information. (Tr. p. 131, 133).   She did not turn on the cell phone.  (Tr. p. 131, 137).

When Agent Enterline removed the casing to obtain the serial number, there were three small pieces of paper between the casing and the cell phone. (Tr. p. 133, and Gov. Exh. 3A, B, and C). Government's Exhibit 3A showed writing in blue ink and appeared to be a pass code for a cell phone. (Tr. p. 134).   Government's Exhibit 3B was a piece of paper with writing on it, and Government's Exhibit 3C is a telephone number with the name "Jessica" on it. (Tr. p. 135).   These pieces of paper did not provide information as to the owner of the cell phone.  (Tr. p. 136).

On June 27, 2012, after returning from all of her trainings, Agent Enterline sought a search warrant for the cell phone. (Tr. p. 136).  No one had contacted her regarding the return of the cell phone.  (Tr. p. 136). She contacted Sgt. O'Reilly. (Tr. p. 137).  She was told by Sgt. O'Reilly  that a civilian had come into the Fort Myers Police Department with a found cell phone to turn it in because this person had found images of child pornography on the cell phone and had showed these images to Sgt. O'Reilly. (Tr. p. 137). Sgt. O'Reilly confirmed this information. (Tr. p. 137). He told Agent Enterline that the cell phone was found at a Walmart in Cape Coral. (Tr. p. 137).   He was shown images and he described these images to Agent Enterline. (Tr. p. 137).  She included descriptions of the images Sgt. O'Reilly saw in her affidavit in support of a search warrant for the cell phone.  (Tr. p. 137-138). She presented the search warrant to state court judge, Judge Nick Thompson. (Tr. p. 138). Agent Enterline did not provide any of the images in the application or affidavit in support of the search warrant. (Tr. p. 138-139).  Agent Enterline presented the Search Warrant for the cell phone (Gov. Exh. 1) to Judge Thompson who signed it. (Tr. p. 139).

After obtaining the search warrant there was a forensic analysis done of the cell phone. (Tr. p. 140). Agent Enterline viewed information on the cell phone. (Tr. p. 140). She determined that the cell phone belonged to Alan Johnson, and learned his telephone number and address. (Tr. p. 140-141). Agent Enterline discovered the e-mail address for Alan Johnson and then viewed his public Facebook profile. (Tr. p. 141). She viewed the images on the cell phone. (Tr. p. 141-142). She saw an image that matched a description given to her by Sgt. O'Reilly. (Tr. p. 142). There were over one hundred images on the cell phone. (Tr. p. 142). When she located the cell phone number, she completed an exigent circumstance warrant to the cell phone subscriber to get subscriber information. (Tr. p. 143). The subscriber of the cell phone was Peggy Johnson, and the billing information was sent to Peggy Johnson, but at another address. (Tr. p. 143). The cell phone also contained the name of a Detective Contrell who worked for the Lee County Sheriff's Office and is in charge of checking on sexual offenders. (Tr. p. 143). Another Agent called Detective Contrell and asked about Alan Johnson. (Tr. p. 143). Detective Contrell confirmed that Alan Johnson is a sex offender. (Tr. p. 143).

Agent Enterline believed Alan Johnson was the owner of the cell phone and continued investigating to obtain his address. (Tr. p. 143-144). His address was 1114 Third Way in North Fort Myers. (Tr. p. 144). At this point, Agent Enterline prepared another search warrant for the Johnson's residence. (Tr. p. 144 and Gov. Exh. 4). The search warrant was presented to Judge Thompson who signed it on June 27, 2012. (Tr. p. 145).

Agent Enterline and other officers executed the search warrant of the residence on June 27, 2012. (Tr. p. 145). Johnson and Sparks were at the residence when the search warrant was executed. (Tr. p. 145-146). She and Agent Justin Spence met with Johnson. (Tr. p. 146). The search of the residence produced some hard drives, additional cell phones, and computer equipment. (Tr. p. 146-

147).    There was also children's clothing in the residence, and specifically small female child's clothing.  (Tr. p. 147).

Agent Enterline identified herself to Johnson as did the other officer with her.  (Tr. p. 147). Johnson was standing outside of the residence by Agent Spence's pickup truck. (Tr. p. 147).   She told Johnson the purpose of the search of the residence, and spoke with him for a little while then left Johnson with Agent Spence. (Tr. p. 147-148).   She told Johnson that the officers were executing a search warrant on the residence and that he did not have to speak to the officers, and that he was free to leave or stay, but was not permitted back into the residence. (Tr. p. 148).  He was barred from the residence for the officers' safety and to protect the evidence. (Tr. p. 148).

Johnson agreed to speak to the officers. (Tr. p. 148).  He said that he had lost his cell phone at Walmart in North Fort Myers. (Tr. p. 148).  Johnson thought the officers were there because he had a minor child in the residence and that the neighbors had called in a complaint. (Tr. p. 148). The officers did not ask Johnson about the minor child, he volunteered this information. (Tr. p. 148). Johnson was not under arrest nor in handcuffs. (Tr. p. 148-149).  Johnson volunteered that the minor child was a child of a friend of Sparks, and the child was staying with them for a little while.  (Tr. p. 149).   One of the Agents asked Johnson about his cell phone, and told Johnson that the cell phone that was turned into the police was the reason they were at his residence. (Tr. p. 149).  The Agents told Johnson they wanted to discuss the contents of the cell phone.  (Tr. p. 149). Johnson said he had lost his cell phone but had a new one. (Tr. p. 149).  Johnson stated that the lost cell phone found at Walmart was his, and that he had replaced it and replaced Sparks' cell phone as well.  (Tr. p. 149-150).  Johnson said that Sparks had an old type of cell phone previously so she used his cell phone

-16-

occasionally prior to it being lost especially for access to the internet. (Tr. p. 150). Agent Spence read

Johnson his *Miranda* warnings. (Tr. p. 150).  Johnson signed the form. (Tr. p. 150).

**Cross Examination by Johnson**

On cross examination by counsel for Johnson, Agent Enterline testified that the probable cause

to support the search warrant for the cell phone was solely based upon the information provided by

Sgt. O'Reilly. (Tr. p. 151).    The search of the cell phone pursuant to the Search Warrant led to

probable cause for the search warrant for the residence, which led to the seizure of additional

incriminating evidence. (Tr. p. 151-152).   Johnson's statements were taken during the course of

executing the search warrant of the residence.  (Tr. p. 152).   Every piece of evidence in this case

stemmed from the information provided by Sgt. O'Reilly.  (Tr. p. 152).

Agent Enterline first became aware of the seizure of the cell phone on June 7, 2012. (Tr. p.

152).  There are several other agents on the Innocent Images Task Force in Lee County.  (Tr. p. 153).

She was told by Sgt. Barns, the sergeant in charge of the major crimes unit for the Cape Coral Police

Department that there was no urgency in pursuing an examination of the cell phone. (Tr. p. 153).

She was told that the cell phone was lost property.  (Tr. p. 155-156). No other agent was assigned to

investigate the cell phone. (Tr. p. 154).  Upon returning from her training on June 19, 2012, she picked

up the cell phone and transported it to the FBI. (Tr. p. 154-155).  On June 19, 2012, she opened the

evidence package, and obtained the serial number so that she would have it to prepare the search

warrant upon her return from her final training. (Tr. p. 155). On June 27, 2012, she obtained the

Search Warrant.  (Tr. p. 156).   The Search Warrant was not complicated, and took her less than half

a day to prepare. (Tr. p. 156)-157).  All the information in the Search Warrant was known by the City

of Fort Myers Police Department on June 4, 2012. (Tr. p. 157-158).  There was no investigation of the

cell phone from June 4, 2012 until June 27, 2012, except on June 19, 2012 to obtain the serial number. (Tr. p. 158).

The interview of Johnson while the Search Warrant of the residence was being executed lasted approximately two hours. (Tr. p. 159). The *Miranda* warnings were given after approximately a half an hour of speaking to Johnson. (Tr. p. 159). Johnson acknowledged that he was the owner of the cell phone. (Tr. p. 159). The cell phone had the capability of making telephone calls, texts, storing documents, storing data, internet access, keeping a personal calendar, and other functions as well. (Tr. p. 160). The cell phone could store over one thousand images. (Tr. p. 160-161). Johnson was told that he was not being detained. (Tr. p. 161). The interview occurred at the end of Johnson's street. (Tr. p. 162). When Agent Spence read Johnson his *Miranda* warning, he said that the warnings were a paperwork formality or something to that effect. (Tr. p. 166). Two uniformed officers were present for the search. (Tr. p. 168). The other officers were in plain clothing, but did have firearms that were visible. (Tr. p. 168,170).

After the execution of the Search Warrant of the residence, Agent Enterline spoke with Widner. (Tr. p. 172). Widner said that he only showed images on the found cell phone to Coleman. (Tr. p. 173).

### Cross Examination by Sparks

On cross examination by counsel for Sparks, Agent Enterline testified that even though Coleman, Gallegos and Janetzke thought there were images of child pornography on the cell phone on June 4, 2012, no one notified Agent Enterline until June 7, 2012. (Tr. p. 174-175). Sgt. Barns said that he had a cell phone from the Fort Myers Police Department that was found in Walmart in Cape Coral that may or may not contain images of child pornography. (Tr. p. 176). On June 18, 2012,

Agent Enterline was not scheduled to work, but collected the evidence and dropped it off at the FBI in a secured facility and then on  June 19, 2012, she opened the evidence package containing the cell phone and got the serial number.  (Tr. p. 179)[3].   On June 18, 2012, she was working on a difference case.  (Tr. p. 179).   She was the only agent permitted to obtain the evidence from the Cape Coral Police Department and transfer it to the FBI in this case because the case was assigned to her.  (Tr. p. 179).   On June 26, 2012, Agent Enterline had meetings on another case, but she did make telephone calls to try to contact the state court judge and Sgt O'Reilly but could not reach them until June 27, 2012. (Tr. p. 182).   This is a straightforward case of attempting to ascertain the owner of the cell phone containing images of child pornography.  (Tr. p. 183).    Judge Thompson was not presented with the actual images on the cell phone. (Tr. p. 186).

### G.  Testimony of Task Force Agent Justin Spence

Agent Spence is employed as a detective sergeant with the City of Clewiston Police Department and is a Task Force Agent with the FBI, Innocent Images Task Force.  (Tr. p. 188).   He was present for the execution of the search warrant of the Defendants' residence on June 27, 2012.  (Tr. p. 188-189).   He spoke to Johnson at the scene, and recorded his conversation.  (Tr. p. 189 and Gov. Exh. 6A).   Johnson was not under arrest, was not in handcuffs, and was not detained. (Tr. p. 190).   Johnson agreed to speak to Agent Spence.  (Tr. p. 190). Agent Spence explained to Johnson why they were at the residence, and Agent Enterline was present at that time. (Tr. p. 190).   Johnson

---

[3]  Agent Enterline also testified that on June 19, 2012 she was in meetings on a different case, and on June 20, 2012 she took the evidence, and opened the evidence bag to obtain the serial number.  (Tr. p. 180).  Then later she again testified that it was on June 19, 2012 that she obtained the serial number.  (Tr. p. 180).

was told he was not under arrest. (Tr. p. 190).   Johnson told Agent Spence that he had lost or misplaced his cell phone at a local Walmart store in Cape Coral by leaving it in a shopping cart. (Tr. p. 191).  Johnson had gotten a new cell phone by making arrangements with his cell phone provider to obtain a new phone and had given Sparks a cell phone as well. (Tr. p. 191).  Johnson admitted that he was the owner and sole user of the lost cell phone. (Tr. p. 191).

Agent Spence read Johnson *Miranda* warnings and Johnson signed the *Miranda* waiver form. (Tr. p. 191-192 and Gov. Exh. 5). The *Miranda* warnings form was the standard FBI rights form. (Tr. p. 192).   After signing the *Miranda* waiver form, Johnson agreed to continue speaking to Agent Spence.  (Tr. p. 193).  Johnson never indicated he wanted to stop speaking to Agent Spence. (Tr. p. 193).  Johnson never requested counsel to be present.  (Tr. p. 193).   The conversation occurred outside the residence near Agent Spence's truck.  (Tr. p. 193).  Agent Spence offered to have them sit inside his truck because of the mosquito problem, offered him insect repellant, and water. (Tr. p. 193-194).  At the beginning of the interview, Agent Spence did not ask any questions regarding a minor, and had no information that a minor was at the residence. (Tr. p. 198-199). All the information about the minor was volunteered by Johnson.  (Tr. p. 199).  Johnson admitted to owning the lost cell phone found at Walmart. (Tr. p. 199).  Until providing Johnson with his *Miranda* warnings, Agent Spence had been asking Johnson demographic information about himself and the residence.  (Tr. p. 200). Johnson told Agent Spence that the minor child's parents or guardians needed a break and were fighting so he and Sparks brought the minor child to their residence so he could take care of the minor child with Sparks.  (Tr. p. 200-201).  At that point, there was no conversation about the images on the lost cell phone. (Tr. p. 201).  Until receiving *Miranda* warnings, the only statement Johnson made regarding the lost cell phone was that he was the owner and sole user of it. (Tr. p. 201-202).

After receiving *Miranda* warnings and Agent Spence telling Johnson that law enforcement had the cell phone, Johnson made admissions regarding child pornography. (Tr. p. 202). Agent Spence never threatened or coerced Johnson. (Tr. p. 202-203). Agent Spence felt that he had a rapport with Johnson and the conversation was cordial. (Tr. p. 203). At the end of the conversation, Agent Spence asked Johnson if Johnson would be willing to speak to him again, and Johnson agreed. (Tr. p. 203). Agent Spence had two other brief conversations with Johnson at the scene, one was asking for passwords for electronic devises which Johnson provided to them, and the second was asking if the minor child in an image was the same child that was staying at the residence. (Tr. p. 203-204).

Agent Spence spoke briefly with Sparks at the scene. (Tr. p. 205). Sparks was not under arrest at the time. (Tr. p. 205). Sparks told Agent Spence that the cell phone that was found at Walmart was Johnson's phone. (Tr. p. 205).

On cross-examination by counsel for Johnson, Agent Spence testified that he and Johnson walked together away from the residence to have their conversation. (Tr. p. 207). Johnson could have returned to the residence at any time, but was not permitted to go inside the residence. (Tr. p. 208). Johnson never asked to return to the residence. (Tr. p. 208). Agent Spence was in plain clothes, he had on a t-shirt that identified his agency and khaki pants. (Tr. p. 208). His firearm was visible. (Tr. p. 209). After approximately 20 minutes of the interview, Agent Spence read Johnson his *Miranda* rights. (Tr. p. 210). Agent Spence referred to the *Miranda* rights as a paperwork formality. (Tr. p. 210). Prior to the interview with Johnson, Agent Spence knew of the child pornography on the cell phone, and knew that the cell phone may have belonged to Johnson. (Tr. p. (Tr. p. 213).

On cross-examination by counsel for Sparks, Agent Spence testified that Sparks said that she occasionally used the lost cell phone. (Tr. p. 215). Johnson was the primary user of the cell phone and

the owner of the cell phone. (Tr. p. 215). Sparks used the cell phone on occasion but more as being lent the cell phone to use. (Tr. p. 215).

On redirect examination, Agent Spence testified that at no time during the interview with Johnson did either Agents Spence or Enterline draw or brandish their weapons. (Tr. p. 216-217).  The officers made no threatening gestures.  (Tr. p. 217).  Agent Spence understood from both Johnson and Sparks, that Johnson was the owner of the lost cell phone. (Tr. p. 217).

### H.  Testimony of Jennifer  Sparks

Sparks testified that the cell phone found at Walmart was Johnson and her cell phone. (Tr. p. 218).  She owned another cell phone at the time but her cell phone did not work as well as the lost cell phone. (Tr. p. 219).  The lost cell phone had much better internet access than her cell phone. (Tr. p. 276). She and Johnson operated an internet business. (Tr. p. 276).   She used the lost cell phone to get into their business web site. (Tr. p. 220).  Sparks testified that the lost cell phone was going to be hers when Johnson upgraded his cell phone. (Tr. p. 220-221).  Sparks used the lost cell phone on a regular basis.  (Tr. p. 221).  Sparks kept pictures of her children and other photos on the lost cell phone. (Tr. p. 222). She used the lost cell phone a couple hours a day to access the internet.  (Tr. p. 222).  Sparks used the cell phone while Johnson slept. (Tr. p. 222-223).   She estimated that she used the lost cell phone approximately 30 to 45 percent of the time. (Tr. p. 222).   Her understanding was that the lost cell phone was going to become her phone when Johnson upgraded the cell phone. (Tr. p. 223).  She believed that she was entitled to privacy in the lost cell phone. (Tr. p. 224).

On cross-examination by the Government, Sparks testified that the lost cell phone was Johnson's phone on paper, but he agreed to give Sparks the cell phone when he got his new one. (Tr. p. 225226). She considered the lost cell phone their cell phone. (Tr. p. 226).

## II.  Analysis

The Government asserts that Sparks does not have standing to contest the search of the cell phone at issue in this case. Sparks responds that she was a secondary user of the cell phone and has standing to contest the search of the cell phone. Both Defendants assert that the search of the cell phone by Sgt. O'Reilly exceeded the scope of the search of the private citizens, and therefore any information obtained by Sgt. O'Reilly and all further evidence obtained stemming from his search of the cell phone should be suppressed. The Defendants argue that the delay from the date the cell phone was turned into law enforcement until the date the law enforcement officers obtained a search warrant was unreasonable and all evidence from the cell phone and stemming from the search of the cell phone should be suppressed. Johnson argues that he was in custody at the time of his statements and that he was not given his *Miranda* warnings at the outset of the interview, therefore all of his statements should be suppressed. The Government responds that the search of the cell phone and residence were lawful, and that Johnson was not in custody when he made his statements to Agent Spence.

### A.  Standing of Sparks

The Government asserts that Sparks did not have standing to assert a challenge of the search of the cell phone. Sparks asserts that she had a legitimate expectation of privacy in the cell phone. For a person to assert a violation of the Fourth Amendment, the person must establish a legitimate

-23-

expectation of privacy in the place or object being searched. *Rakas v. Illinois*, 439 U.S. 128, 148-149 (1978). Fourth Amendment rights are personal rights and cannot be vicariously asserted. *Id*. at 133-134. For a person to have standing to challenge a search, a person "must manifest a subjective expectation of privacy in the invaded area that society is prepared to recognize as reasonable." (quotation marks omitted) *United States v. Moncur*, 2011 WL 3844096, *4 (S.D. Fla July 28, 2011) (citing *United States v. Cooper,* 133 F.3d 1394, 1398 (11th Cir, 1998) (quoting *Rakas*, 439 U.S. at 143, n12)). Possession alone of the item being searched is not sufficient to confer standing to challenge a search. *Id*. (citing *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008)). The burden is on the person challenging the search, and the motion to suppress must contain allegations of standing that are "sufficiently detailed and specific." *Id*. (citing *United States v. Eyster*, 948 F.2d 1196, 1209 (11th Cir. 1991)). In the instant case, the Court will accept Sparks' Reply (Doc. 32) which sets forth her assertions as to standing.

There was sufficient testimony that established that Johnson was the owner and primary user of the cell phone that was found by Widner. Sparks testified that even though Johnson was the primary user, she also used the cell phone 30 to 45 percent of the time. Sparks used Johnson's cell phone to access the internet, especially for their internet business. Sparks testified that she stored photographs, documents, and other information on the cell phone. She used it to make telephone calls, and knew that the cell phone was going to be given to her when Johnson upgraded to a new cell phone. Spence testified that Johnson told him that he was the owner and sole user of the cell phone, however, Spence acknowledged that he was told that Sparks used the cell phone occasionally. Sparks' testimony established that she used the lost cell phone to such an extent as to have a privacy interest in its contents. She used the cell phone at least 30% of the time and stored photographs and

other information in the cell phone. Therefore, the Court finds that Sparks has established a legitimate

expectation of privacy in the cell phone, and for the purpose of the Motion to Suppress, Sparks has

standing to contest the search of the cell phone.


**B.  Scope of Search by O'Reilly**

The Defendants assert that Sgt. O'Reilly searched the cell phone without a warrant, and

therefore, the information he obtained from his search should be suppressed, and any subsequent

information obtained as a result of the search of the cell phone should be suppressed.   The

Government asserts that Sgt. O'Reilly's search of the cell phone did not exceed the scope of the search

of the cell phone by private citizens, and therefore, the information should not be suppressed.

The Fourth Amendment protects the "right of people to be secure in their persons, houses,

papers and effects, against unreasonable searches and seizures. . ." U.S. Const. amend. IV.  Clearly,

searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment - subject

to only a few specifically delineated exceptions.  *Collidge v. New Hampshire*, 403 U.S. 443, 454-55

(1971).  Therefore, warrantless searches are presumptively unreasonable.  *Kyllo v. United States*, 533

U.S. 27, 31 (2001).   The Supreme Court has construed the Fourth Amendment protection "as

proscribing only governmental action" and is not applicable to a search by a private individual who

is not acting as a government official.  *United States v. Jacobsen*, 466 U.S. 109, 114 (1984).   Even

if a private individual independently examines an object that might have been impermissible if done

by a government official, the search by the private individual is not unreasonable.  *Id*.  The Court must

consider the invasion of a person's privacy by the government official to determine if it was

reasonable.  *Id*.  Government officials are not required to avert their eyes when they obtain information

from a private individual based upon a search done by that individual. *United States v. Miller*, 425 U.S. 435, 443 (1976). A police officer may view or replicate a private search as long as the officer does not exceed the scope of the private review. *United States v. Durdley*, 2010 WL 916107, *6 (N.D. Fla. March 11, 2010). An individual may retain his legitimate expectation of privacy after a private search, however, "additional invasions of [a person's] privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." *Jacobsen*, 466 U.S. at 115. When an officer views the same items that a private individual views to confirm the contents, this action on behalf of the officer does not violate the Fourth Amendment because "[p]rotecting against the risk of misdescription hardly advances any legitimate privacy interest." (internal quotation marks omitted), *Jacobsen*, 466 U.S. at 119. The Court must consider whether the officer obtained information from his search that could not have been learned from the private searcher's testimony, and if so whether the defendant had a legitimate expectation of privacy in this information. *United States v. Runyan*, 275 F.3d 449, 461 (5th Cir. 2001) (citing *Jacobsen*, 466 U.S. at 118-120)).

In the instant case, private citizens Widner and his wife, Linda Vo viewed images on the cell phone. These images were located in two photo albums on the cell phone. Widner testified that he had scrolled through the images on the cell phone and saw thumbnails of the images but could not recall all the images he viewed. Widner testified that he had shown possibly one image to the employees at the Fort Myers Police Department. Widner also testified that his wife said that there were videos on the cell phone, but he had only viewed the still images.

In conflict with Widner's testimony, Gallegos testified that Widner showed her images on the cell phone. Gallegos claimed that Widner turned on the phone and showed Gallegos and Janetzke how the phone worked. Then, Widner scrolled through the images on the phone and would stop at

a few of them. Gallegos estimated she saw hundreds of images on the cell phone but could not identify all of the images she saw. Janetzke confirmed that Widner showed her and Gallegos hundreds of images on the cell phone, stopping at a few of the images as he scrolled.

Sgt. O'Reilly testified that he wanted to verify that the images on the cell phone were child pornography. He turned on the cell phone and viewed the images on it for approximately one minute. He saw enough images to confirm that the cell phone contained child pornography. The only folder he viewed was the one containing images, and he did not look in any other folder or anywhere else on the cell phone. He could not identify the exact images that he viewed. He then turned off the cell phone and submitted it into evidence.

The issue is whether Gallegos and Janetzke[4] and Sgt. O'Reilly exceeded the scope of Widner and Vo's search of the cell phone. The testimony provided that Widner and Vo had viewed images in two photo albums on the cell phone, and that Vo indicated there were some videos on the cell phone as well. The search of the cell phone by Sgt. O'Reilly was limited to some of the images on the cell phone. Gallegos, Janetzke, and Sgt. O'Reilly viewed only the images portion of the cell phone. There was no testimony that Gallegos, Janetzke or Sgt. O'Reilly viewed or searched any other portion of the cell phone. Although none of the witnesses could identify with specificity every single image that they viewed, all of the images and videos were located in the same area of the cell phone, in the images area. The Defendants' privacy interests in the images area of the cell phone had been compromised by the private searches by the private citizens. Law enforcement's search of the cell phone was limited to the area of the cell phone that the private citizens had searched. *See*, *United States v.*

_____

[4] The Court is unsure as to the status of Coleman, Gallegos, and Janetzke. They are not officers of the Fort Myers Police Department, but are employees there. The Court will consider them government officials for the purpose of the Motions to Suppress.

-27-

*Simpson*, 904 F.2d 607, 610 (11th Cir. 1990) (Box's content had been examined by private individuals, and law enforcement's more thorough search of the contents of the box without a warrant did not violate the Fourth Amendment), and *United States v. Garcia-Bercovich*, 582 F.3d 1234, 1238 (11th Cir. 2009) (officers did not exceed scope of private search by viewing a separate box than the private citizen viewed because multiple boxes constituted a single package).   The Court determines that Gallegos, Janetzke, and Sgt. O'Reilly were told that there were images of child pornography on the cell phone, and Widner and Vo would have been able to testify that they found images of child pornography on the cell phone.   Gallegos, Janetzke, and Sgt. O'Reilly confirmed Widner's statements that he and his wife found images of child pornography on the cell phone.   These images were found in the images portion of the cell phone.   The officers only looked in that area of the cell phone. Although a cell phone may be more akin to a computer than a box, in this case the officers limited their search to the one area of the cell phone where the private individuals searched, and the officers did not search any other area such as the contacts, e-mails, or text messages.   The Court finds that Gallegos, Janetzke, and Sgt. O'Reilly did not exceed the scope of the private search.

### C.  Delay in Obtaining Search Warrant

The chronology of the incident is as follows.   On June 4, 2012, Widner's wife found a cell phone at a Walmart located on Pine Island Road.   She called Widner and he retrieved the cell phone. On June 4, 2012, he took the cell phone to the Fort Myers Police Department.   The Fort Myers Police Department retained the cell phone, and on June 5, 2012, Sgt. O'Reilly logged the cell phone out of evidence and delivered it to the Cape Coral Police Department.   On June 7, 2012, while Agent Enterline was on her way to a training, she received a call from her sergeant to say that he had received

a new case regarding child pornography found on a cell phone.  She was told it was "no big deal" and she could review the case when she returned from her training.  On June 19, 2012, Agent Enterline returned from her first training, retrieved the cell phone which was in evidence at the Cape Coral Police Department and then transferred the evidence to the FBI.  On June 19, 2012, Agent Enterline opened the evidence package to obtain the serial number for the cell phone, and a description of the cell phone.  On June 27, 2012, after returning from her final training, Agent Enterline obtained a search warrant for the cell phone.  Law enforcement had the cell phone in its possession from June 4, 2012 until June 27, 2012 before obtaining a search warrant for the cell phone, a time period of 23 days.

A recent Eleventh Circuit case, *United States v. Laist*, ___ F.3d _____, 2012 WL 6156278, *3 (11th Cir. Dec. 11, 2012) addressed the issue of delay in obtaining a search warrant relying on its prior decision in *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009).  The Supreme Court has held that "it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband." (internal quotation marks omitted). *United States v. Laist,* 2012 WL 6156278 at *4 (quoting *United States v. Jacobsen*, 446 U.S. 109, 121-122 (1984)).  An otherwise lawful seizure can violate the Fourth Amendment and infringe on an owner's possessory interests if law enforcement acts with unreasonable delay in securing a search warrant.  *United States v. Emanuel*, 440 Fed. App'x. 881, 885 (11th Cir. 2011) (citing *United States v. Mitchell,* 556 F.3d 1347, 1350 (11th Cir. 2009)).  Whether the delay is reasonable must be determined by a careful balancing of the governmental and private interests.  *United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009)

(citing *Soldal v. Cook County*, 506 U.S. 56, 71 (1992) and *United States v. Prevo*, 435 F.3d 1343, 1345 (11th Cir. 2006)).

After a warrantless seizure predicated upon a finding of probable cause occurs, law enforcement officers must diligently obtain a search warrant within a reasonable amount of time. *United States v. Laist*, 2012 WL 6156278 at *4 (citing *Illinois v. McArthur*, 531 U.S. 326, 334 (2001)). Courts have not established a *per se* rule to determine a reasonable delay, rather the Supreme Court held "that a court must balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id*. (citing *Illinois v. McArthur* 531 U.S. at 331). "Thus, when determining whether a delay renders a seizure unreasonable under the Fourth Amendment, we evaluate the totality of the circumstances presented by each case." *Id*. (citing *United States v. Mitchell*, 565 F.3d 1347, 1351  (11th Cir. 2009)).

Courts have identified "several factors highly relevant" to the inquiry of whether the delay in obtaining search warrant was reasonable. *Id*.  The first factor is to consider the interference with the person's possessory interest. *Id*. (citing *United States v. Mitchell*, 565 F.3d at 1351). Second, the court must consider the length of the delay.  *Id*. (citing *United States v. Place*, 462 U.S. 696, 709 (1983). Third, the court must consider whether the individual consented to the seizure.  *Id*. (citing *United States v. Stabile*, 633 F.3d 219, 253 (3d Cir. 2011). Fourth, the court must consider the "government's legitimate interest in holding the property as evidence." *Id*. (citing *United States v. Burgard,* 675 F.3d 1029, 1033 (7th Cir. 2012)).

Johnson asserts that cell phones are similar to computers and the Eleventh Circuit found that computers are relied upon for personal and business use because people store personal and financial information on computers including family photos, passwords, correspondence, e-mails and other

information. *United States v. Mitchell*, 565 F.3d at 1351. In *United States v. Mitchell*, the Eleventh Circuit determined that a three week delay in obtaining a search warrant for the search of a computer constituted "a significant interference with Mitchell's possessory interest." *Id.* Even if a defendant admits to having contraband on his computer, the hard drive is likely to contain other non-contraband information of "exceptional value to its owner" and until an agent examines the hard drive, he cannot determine whether the hard drive actually contains contraband or if the defendant is mistaken. *Id.*

An additional factor to determine is whether law enforcement officers pursued the investigation diligently. *United States v. Lait*, 2012 WL 6156278 at *5. (citing *Place,* 462 U.S. at 709). Some additional factors to consider is the complexity of the investigation, whether law enforcement was diverted to another case, the quality and amount of time needed for the warrant application, and any other relevant factors. *Id*.

Johnson and to a lesser degree Sparks retained a possessory interest in the cell phone. Johnson and Sparks had personal information in the cell phone such as photographs, contacts and other personal and potentially business information. Sparks testified that she used the cell phone to conduct business. However, Johnson and Sparks' possessory interests were diminished by several factors. First unlike the cases cited above, the cell phone was not seized by law enforcement officers, but was lost and ultimately brought to the City of Fort Myers Police Department by a private citizen. Further, except for a text or two, there was no evidence that Johnson or Sparks attempted to recover the cell phone by going to any law enforcement office to try to recover the cell phone. In addition, although a cell phone can act as a computer, it is much smaller and more mobile than a computer. A cell phone is designed to be carried with an individual, and the possibility that it will be lost or misplaced is much higher. In this case, private citizens were able to access the information in the cell phone and

-31-

there was no testimony that the cell phone had a password to prevent access.  Further, in this case, private citizens viewed what they considered to be child pornography, and later Sgt. O'Reilly viewed what he considered to be contraband, therefore, law enforcement were assured that there was probable cause to believe that the cell phone contained contraband.  These factors diminish Johnson and Sparks' interests and enhances the Government's legitimate interest in "maintaining custody" of the cell phone as "substantial evidence of a serious federal crime."  *United States v. Laist*, 2012 WL 6156278 at *7.

Even though Johnson and Sparks had diminished possessory interests in the cell phone, the Court must consider whether the officers were diligent in obtaining a warrant.  The Defendants rely heavily on *Mitchell, supra*, in that the officer's only reason why there was a twenty-one delay in obtaining a warrant which was that "'he didn't see any urgency of the fact that there needed to be a search warrant during the two weeks that [he] was gone,' and that he 'felt there was no need to get a search warrant for the content of the hard drive until [he] returned back from training.' *United States v. Mitchell*, 565 F.3d at 1351.  Further, the officer in *Mitchell* stated that Mitchell's admission that the hard drive contained child pornography eliminated any sense of urgency.  *Id*.  In *Mitchell*, the agent obtained the hard drive and two and a half days later went on a two-week training program.  *Id*.  Another agent accompanied the first agent to seize the hard drive, but did nothing to obtain a search warrant while the first agent was in training. *Id*.  The search warrant was mainly boiler-plate language, and contained less than 3 pages of original content.  *Id*.

In the instant case, unlike in *Mitchell*, Agent Enterline was at the airport when she received the call about information regarding child pornography on a cell phone.  She could not begin her investigation until she returned from her training.  When she returned from her training, she obtained

the cell phone from the Cape Coral Police Department and transferred it to the FBI.  She obtained identifying information from the cell phone so that on her return from her next consecutive training, she could obtain a search warrant.  On the day she returned from her last training, Agent Enterline prepared the search warrant and applied for it.  There was no testimony that another agent was assigned to this case, or had familiarity with case.

The reason to obtain a search warrant without delay after a seizure is to return property that is not contraband to the owner.  *Mitchell*, 565 F.3d at 1352.  In the instant case, this overriding reason to obtain a search warrant was clearly diminished when Sgt. O'Reilly viewed contraband on the cell phone.  Sgt. O'Reilly testified that after he viewed the images, the cell phone would not be returned to the owner.  Although the twenty-three day delay was not ideal in this case, the cell phone was not initially seized property, but was rather turned into law enforcement as a lost cell phone.  A law enforcement officer immediately viewed contraband on the cell phone.  These facts greatly diminish Johnson and Sparks possessory interest in the cell phone.  Other than a text or texts reported by Vo and Widner, there was no other evidence that Johnson or Sparks made concerted  attempts to obtain the cell phone such as contacting law enforcement to report that it was lost. In fact, Johnson quickly replaced the cell phone after he lost it and it was not returned.  Agent Enterline did pursue the search warrant as soon as she was able based on her training schedule.  Reviewing the totality of the circumstances, the Court finds that the Government was sufficiently diligent and did not violate the Fourth Amendment.  Therefore, the Court finds that the Government's interests in retaining the cell phone outweigh the possessory interests of Johnson and Sparks.

### D.  State Judge Issued Warrant Without Viewing Images

Sparks raised the issue that Judge Nick Thompson did not view the images of the child pornography, therefore the state search warrant for the cell phone was invalid.  The Government argues that a judge is not required to view the images of child pornography prior to issuing a search warrant.  Sparks failed to cite and the Court could not find any federal cases in this Circuit which require that a judge who issues a search warrant to search for child pornography is required to view the alleged pornographic images prior to issuing a search warrant.  *See*, *United States v. Rubinstein,* 2010 WL 2723186, *7 (S.D. Fla. June 24, 2010).  Therefore, the Court finds that Judge Thompson was not required to view the pornographic images prior to issuing the search warrant.

### E.  *Miranda* Rights for Johnson

During the execution of the search warrant of his residence, Johnson asserts that he was not read his *Miranda* rights until after questioning had already begun in violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  Johnson asserts that he was not free to leave and therefore any statements made by him should be suppressed. The Government asserts that Johnson was not in custody at the time of the interview and therefore, no *Miranda* warnings were required to be given, and Agent Spence eventually did provide *Miranda* warnings.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  A court must exclude from evidence any incriminating statements made by an individual if, prior to making the statement, the individual was not warned of his right to remain silent and the right to obtain counsel.  *United States  v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010), *Miranda v. Arizona*, 384 U.S. 436 (1966).  These rights

-34-

attach, however, only if an individual is in custody at the time the statements were made and subject to an interrogation by officers. *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2401 (2011). In the instant case, the Government did not argue that a police interrogation did not occur, therefore, the Court will consider only the first prong, whether the Defendant was in custody at the time he made incriminating statements.

Any police interview or interrogation of a suspect has "'coercive aspects to it.'" *J.D.B.*, 131 S.Ct. 2401 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curium*)). Interviews conducted while a suspect is in police custody have a heightened risk that the statements made were coerced. *Id*. (citing *Dickerson v. United States*, 530 U.S. 428, 435 (2000)). Because the "inherently coercive nature of custodial interrogation 'blurs the line between voluntary and involuntary statements,' [citation omitted], [the Supreme Court] adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *Id*. Prior to questioning an individual in custody, officers must inform the individual of his right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to have counsel present. *Id*. (citing *Miranda v. Arizona*, 384 U.S. at 444).

A suspect is considered to be in custody for the purposes of *Miranda* when there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted). Courts must look to the totality of the circumstances surrounding the interrogation or interview to determine whether "'a reasonable man in [the suspect's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (quotation marks and

alterations omitted). Some factors to consider include the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning. *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012) (citations omitted). The test to determine custody is an objective one, the actual or subjective beliefs of the defendant and the interviewing officer on the issue of whether the defendant is free to leave are "irrelevant." *United States v. Brown,* 441 F.3d at 1347 (citing *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id.* (citing *United States v. Moya*, 74 F.3d at 1119) (quotation marks omitted, emphasis added). A court must conduct two distinct inquiries, first the court must consider the circumstances surrounding the interrogation, and second given those circumstances, would a reasonable person feel that he was at liberty to terminate the interview and leave the scene. *J.D.B. v. North Carolina*, 131 S.Ct. at 2402, *United States v. Gomes*, 279 Fed. App'x. 861, 868 (11th Cir. 2008) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The Court must consider all of the facts and weigh the evidence presented. *United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006). No one fact is determinative of the issue of whether the interview was custodial or not. *Id.* Courts have found that a neutral and familiar setting is a significant factor weighing against a court finding a custodial interrogation. *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006), *United States v. Gomes*, 279 Fed. App'x 861, 868 (11th Cir. 2008). "The fact that a person is not free to leave on his own terms at a given moment, however, does not, by itself, mean that the person has been 'seized' within the meaning of the Fourth Amendment. *Chandler v. Sec. of Fl. Dept. of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012) (citing *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). The protections of the Fourth Amendment are not to prevent all

contact between law enforcement and private citizens but to "prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Id.* (internal quotation marks omitted) (quoting *Florida v. Bostick*, 501 U.S. 429, 553-554 (1991) quoting *United States v. Martinez-Fuerte*, 429 U.S. 543 (1976)).

The Court determines that Johnson was not in custody for the purposes of *Miranda*. The interview took place near Johnson's residence close to Agent Spence's truck. Agent Spence testified that he spoke to Johnson outside of Johnson's residence on June 27, 2012 when other agents were executing the search warrant for Johnson's residence. Agent Spence and Johnson walked away from the residence to Spence's truck to conduct their conversation. Johnson was not permitted to go inside of his residence, but was permitted to return to the residence. Johnson was never handcuffed or restrained during the interview. None of the officers brandished their weapons. Agent Spence explained why the officers were at the residence and told Johnson he was not under arrest. The interview does not rise to the level of restraining Johnson's movements to the degree associated with a formal arrest. A reasonable innocent person in Johnson's situation would not feel that he was restrained to the point that he was not free to leave. Therefore, the Court finds that Johnson was not in custody during the interrogation and therefore, no *Miranda* warning were required to be given.

### F. Fruit of the Poisonous Tree

Johnson and Sparks argue that all evidence should be suppressed because law enforcement officers exceeded the scope of the private search and unreasonably delayed in obtaining the search warrant for the cell phone. The Court must determine whether the evidence was obtained by the exploitation of an initial illegality, or if it was obtained in some manner that would purge the primary

taint. *United States v. Smith,* 688 F.3d 730,  738 (11th Cir. 2012).  The fruit of the poisonous tree

doctrine is limited, and the Court must consider whether the illegal police action was so attenuated

that the deterrent affect of the exclusionary rule no longer justifies that cost of excluding the evidence.

*Id*.  In the instant case, the Court finds that law enforcement officers acted lawfully, therefore, the

evidence seized and the statements made were not the fruit of the poisonous tree and should not be

suppressed.


### III.  Conclusion

The Court finds that based on the testimony, evidence, and law,  Sparks has standing to contest

the search of the lost cell phone, law enforcement did not exceed the scope of the search conducted

by private citizens, the state court judge was not required to view the images prior to issuing a

warrant, the delay in obtaining the search warrant did not violate the Fourth Amendment, and Johnson

was in not custody at the time of his interrogation which occurred during the execution of the search

warrant.

**IT IS RESPECTFULLY RECOMMENDED:**

1) Spark's Motion to Suppress Evidence (Doc. 25) be **DENIED**.

2) Johnson's  Motion to Suppress (Doc. 38) be **DENIED**.

3) Johnson's  Motion to Suppress Statements (Doc. 39) be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this   8th    day of February, 2013.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record