UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

vs.                                          2:12-cr-92-FtM-29DNF

ALAN JOHNSON
JENNIFER SPARKS
_____

**OPINION AND ORDER**

A Report and Recommendation (Doc. #64) recommended that Defendant Sparks' Motion to Suppress Evidence (Doc. #25), defendant Johnson's Motion to Suppress (Doc. #38) and defendant Johnson's Motion to Suppress Statements (Doc. #39) be denied. Both defendants filed objections (Docs. #68, 71.)  In a prior Opinion and Order (Doc. #88), the Court adopted the Report and Recommendation as to the "standing" of defendant Jennifer Sparks.  The Court also scheduled an additional hearing so the Court could hear the testimony of four specifically identified witnesses in light of inconsistent testimony impacting the scope of the conduct by the private parties.  The Court conducted that hearing on July 16, 2013.  On July 30, 2013, the Court declined to allow the government to essentially re-open the hearing to introduce additional evidence.  (Doc. #96.)

The Court adopts the first portion of its prior Opinion and Order (Doc. #88), and adds the following.

**I.**

**B.   Actions By Private Citizens and Interaction With Police**

The facts which the Court finds credible are set forth below. The Court adopts the Report and Recommendation (Doc. #64, pp. 3-23) to the extent it is consistent with these findings, and overrules the factual objections by defendants to the extent they are inconsistent with these findings.

**(1)  Linda Vo and David Widner**

Linda Vo (Vo) found a cell phone in a shopping cart at Wal-Mart in Cape Coral/North Fort Myers, Florida, where she worked. The details of what she did with the cell phone are incomplete, at best, because she was not called as a witness at the evidentiary hearings.  Vo's fiancè/husband[1], David Widner (Widner), did testify, and related at least some of what Vo had said and done. Both Vo and Widner are private persons who had no connection with law enforcement relating to the events of this case.

After finding the cell phone, Vo apparently called a woman who stated she was the owner of the cell phone, and made arrangements to return the cell phone to her.  There is no direct testimony as to how Vo determined who owned the cell phone or how she knew what number to call.  Thereafter, Vo looked at some images on the cell phone, apparently in an attempt to determine what the owner looked

---

[1]Throughout the testimony of the witnesses, Vo is referred to as Widner's "wife", "girlfriend", or "fiancè" depending on the speaker.

like.  In doing so, Vo saw what Widner later characterized as
"questionable" images.  Vo called or texted Widner to report her
discovery, stating she saw some images that were "pretty weird"
involving pictures of a young girl who was nude in some pictures.
The record contains no direct evidence concerning what Vo had done
to the cell phone in order to see the images, how many images she
had seen, which images she had seen, or where in the cell phone the
images were located.  Widner testified that Vo told him there was
also a video on the cell phone, but there is no testimony that Vo
viewed the video.

On June 4, 2012, Widner went to the Wal-Mart store and met Vo.
Vo showed Widner the cell phone, which was not password protected.
Looking in the photo album area of the cell phone, Vo showed Widner
a full size picture of a girl sitting in the back seat of a car
wearing pink shorts, then zoomed out (by tapping the image) to a
screen full of smaller "thumbnail" images.  Vo proceeded to scroll
through thumbnail images on the cell phone photo album with Widner,
who looked at all the images and could see the entirety of the
images, albeit in a smaller format.  Vo stopped scrolling at a
second image, which she enlarged for Widner, showing three young
(prepubescent) girls standing naked in the middle of a room and
posed awkwardly in what Widner considered a sexually suggestive
manner. Widner recalled a third full sized image which he was
shown, which centered on a young girl's nude genital area and

depicted apparent semen on her stomach.   Widner previously testified he recalled viewing an image of a nude four or five year old girl lying on a bed posed in an awkward position, but with no sexual context other than the nudity, and multiple other images of the same child in different poses.   Widner testified he did not recall the content of the thumbnail images clearly. Widner stated that Vo told him there were many more images involving children, but he did not know how many images Vo had viewed on the cell phone.   Widner testified that Vo stated the images were getting worse as she scrolled.   Widner did not recall seeing any adults in these photographs.   This was the only time Widner looked at the contents of the cell phone prior to taking it to the Fort Myers Police Department.

In light of the nature of the images, Widner took the cell phone from Vo in order to turn it over to the police.   As was his habit, Widner hit the button to return the cell phone to the home screen.   After doing so, Widner saw there were two photo albums, each with roughly 500 images.[2]   Widner did not look at any of the images in the second photo album, and did not know if they were of the same nature as those in the first photo album.   While Vo had

---

[2]At the first evidentiary hearing, Widner testified the photo album he actually viewed contained about 1,000 images, and the second album contained about 500 images.

told Widner there was also a video in the cell phone, Widner testified that he never personally viewed the video.[3]

Because Widner did not know where the Cape Coral Police Department was located, on June 4, 2012, he took the cell phone to the Lee County Sheriff's Office in downtown Fort Myers. Widner was told by Sheriff's Office personnel to take the cell phone to the Fort Myers Police Department, which he did.

At the Fort Myers Police Department, Widner spoke with a person at the front booth (Community Service Aide (CSA) Cassie Coleman), stating that he wanted to file a report about cell phone images which he thought were child pornography. The cell phone was already on, and Widner pushed the power button to bring up a swipe screen, swiped the screen to activate the cell phone, touched the photo gallery icon to get to the photo albums, and clicked on one of the two albums. Widner scrolled quickly (because the cell phone battery was dying) through the entire album looking for the image of the girl in pink shorts sitting in the back seat of a car, which he was going to use as a marker for which album contained the offending images. Widner went through that entire first photo album, then scrolled back up and found the image and handed the cell phone to CSA Coleman. At that time the cell phone died.

---

[3]Testimony from another witness contradicts this aspect of Widner's testimony. The Court makes its credibility findings later in this Opinion.

Widner obtained a cell phone charger from his car and gave it to CSA Coleman, who began to recharge the cell phone.  Widner took a seat in the police station lobby, and shortly thereafter two female officers (CSA Sarah Gallegos and CSA trainee Amanda Janeszke) came to speak with him.  Widner told the CSAs that Vo had contact with the female owner of the cell phone, who had asked that the cell phone be returned.  Widner also reported that arrangements had been made with the female owner to pick up the cell phone, but then his wife viewed the images on the cell phone and Widner determined that the cell phone had to be taken to the police.  The CSAs called Vo from Widner's cell phone, but Widner did not overhear their conversation.  Widner explained the types of images he saw, describing the images he most remembered, such as the ones Vo had enlarged.  Widner told the officers there were two different photo albums containing roughly 1,000 images.  Widner saw CSA Coleman looking through the cell phone, but could not see what she was looking at.  Widner also saw the other two CSAs looking at the images, but was not able to see the images the CSAs viewed and did not know if they viewed the same images he saw or how many images they viewed.  Other than the one image he showed to CSA Coleman, Widner testified he never looked at any of the images with any of the officers, and did not see the cell phone again after handing it

to CSA Coleman for recharging.[4]  Widner had no contact or discussion with Sgt. O'Reilly.  Widner left the cell phone with the Fort Myers Police Department.

   (2)  **Classie Coleman, Sarah Gallegos, and Amanda Janetzke**[5]

   **Classie Coleman (Coleman)** is a CSA who was working at the front lobby of the Fort Myers Police Department on June 4, 2012. Coleman testified that Widner approached her window in the lobby and told her that his girlfriend had a found cell phone from a shopping cart in the parking lot at Walmart in Cape Coral; that he did not know the location of the Cape Coral Police Department; that someone had called on that cell phone to retrieve the cell phone, and arrangements had been made to do so; that he had received several texts from the owner, but did not provide Coleman the owner's name; that there were some pornographic/disgusting images of young children on the cell phone; and that there were over 200 disturbing images on the cell phone, which was the reason he was turning the cell phone over to law enforcement.  Widner scrolled through the cell phone, then passed it to Colemen in an attempt to show her a picture on the cell phone.  The cell phone went dead, and Coleman did not see any image.  Widner then went to his car to obtain a

---

[4]Testimony from other witnesses contradict this aspect of Widner's testimony.  The Court makes its credibility findings later in this Opinion.

[5]The Court considers these three witnesses to be government officials for purposes of the Fourth Amendment analysis, as did the Report and Recommendation (Doc. #64, p. 27, n.4.)

charger, which Coleman plugged into her computer to recharge the cell phone. Coleman testified that Widner told her he had received a text on the cell phone while he was in the lobby of the police department. Widner told Coleman that the owner was texting to the cell phone to try to retrieve it, and he had the first name of the person. Coleman never asked Widner to show her the text messages or to provide the name of the owner of the cell phone. Colemen did not see any pop-ups on the cell phone. Coleman did not herself turn on, scroll through, or bring up any pictures on the cell phone.

Coleman asked CSA Sarah Gallegos (Gallegos) to contact a supervisor for directions about how to proceed, and Gallegos left to find a supervisor. Coleman testified that after five or ten minutes Sgt. Brian O'Reilly (Sgt. O'Reilly) came to the booth area with Coleman. Widner remained in the lobby, and Sgt. O'Reilly did not have direct contact with Widner.[6] While in the booth, Coleman saw Sgt. O'Reilly scroll through images on the cell phone, with Gallegos and Janetzke looking at the images as he did so. Widner was not in the vicinity at this time. When Sgt. O'Reilly was scrolling through the cell phone thumbnail images, Coleman saw five

---

[6]At the second evidentiary hearing, Coleman testified that Sgt. O'Reilly made contact with Widner in the lobby with Gallegos and Janetzke, but they were not looking at the cell phone at that time. The Court finds Coleman is mistaken about this, and finds that Sgt. O'Reilly had no direct contact with Widner, as Coleman had previously testified and as Sgt. O'Reilly, Widner, and Gallegos testified.

or six disturbing images on the cell phone, and thereafter refused to continue viewing the images.  She recalled at least two specific pictures she observed.

**CSA Gallegos** testified that she was told by CSA Coleman that Widner had found a cell phone in Cape Coral which depicted images of children which were possibly pornographic.  Gallegos then met with Widner in the lobby of the Fort Myers Police Department, along with CSA trainee Amanda Janetzke (Janetzke).  Widner told Gallegos that his fiancè found the cell phone in a shopping cart at Walmart in Cape Coral; that his fiancè received a text message regarding the phone being returned and providing information for the person to pick up the phone; that somehow his fiancè viewed disturbing images of children on the cell phone; and that he had also looked at the images, which included children being molested, and decided to bring the cell phone to the police.  Gallegos testified she was told there were also text messages on the cell phone from the possible owner, who Widner believed was named Alan, and text messages from a woman as well.  Gallegos had Widner call Vo, who told Gallegos that she had received text messages on the cell phone from a woman who said she needed the cell phone back immediately.  Vo only knew the first name of the woman, which Gallegos did not recall.  Neither Vo nor Widner knew any last names.  Gallegos did not attempt to text the possible owners of the cell phone.

Gallegos removed the cell phone from the computer through which it had been recharging, and handed it to Widner in the lobby. Widner immediately accessed the contents of the cell phone by clicking on the photo album icon, and began showing thumbnail images to Gallegos. For approximately five minutes Widner showed Gallegos hundreds of images on one photo album in the cell phone, which included images of children, private parts, and an adult. Widner would scroll through the cell phone showing images of nude children, some of whom were in staged sexually suggestive situations, and stop on quite a few of the images. At a couple points Widner handed the phone to Gallegos, told her to click on the next photo, which she did, and then handed the cell phone back to him. Gallegos recalled the content of some of the images she was shown, including one depicting an exposed penis and an underage female with semen on her stomach who appeared to have engaged in sexual activity. Gallegos looked at hundreds of images and, in addition to the thumbnail images, Widner showed her about 15 to 20 full size images. Gallegos also looked at one video Widner showed her of a child eating ice cream.

After viewing the images on the cell phone, Gallegos took the cell phone and contacted a lieutenant and the on-duty sergeant, Sgt. O'Reilly. Gallegos told Sgt. O'Reilly what she had observed on the cell phone and what Widner had told her, and explained as best she could the area of the phone she had been shown. Gallegos took Sgt.

O'Reilly back to CSA Coleman's booth and showed him the images Widner had shown her on the cell phone in the presence of Coleman and Janetzke.  Gallegos scrolled through the cell phone images for a while, then handed the cell phone to Sgt. O'Reilly and explained how to scroll forward.  Gallegos saw Sgt. O'Reilly view  images in the same photo album as she had viewed for a couple of minutes. Widner was not in the immediate vicinity.  Neither Gallegos nor Sgt. O'Reilly obtained a search warrant to view the images on the cell phone.  As directed by Sgt. O'Reilly, Gallegos made a found article report, and put the cell phone in the found property section of the evidence room.

**CSA trainee Janetzke** testified that on June 4, 2012, she and Gallegos met with Widner in the lobby of the police department. Widner told them that the cell phone contained inappropriate sexually explicit photographs that resembled children, and wanted to show them the pictures because he did not know how to describe them. For five or ten minutes Widner scrolled down the thumbnail images on the cell phone to the bottom, viewing a number of photos of a little girl inappropriately posed.  There were hundreds of images on the cell phone, and Widner would stop to display full size images as he scrolled down. Widner appeared to have certain images in mind that he wanted to find and show Janetzke and Gallegos. Janetske was shown approximately ten full-size images, but could see

all the images even as thumbnails.  Janetzke described some of the pictures she recalled.

Janetzke saw Gallegos make telephone contact with Vo and receive the first names of possible owners.  Widner told Gallegos and Janetzke that texts were coming to the cell phone with a first name only, and the texts indicated that the sender wanted the cell phone back.  Janetzke saw some of the texts pop up on the cell phone, and the texts were providing information as to where they could meet to get the cell phone back.  Janetzke recalled a reference to "Alan's girl", but made no attempt to communicate with this person.

Once Janetzke or Gallegos determined that the situation was serious, they contacted Sgt. O'Reilly.  Janetzke testified that she told Sgt. O'Reilly about the images on the cell phone, and Gallagos showed him several images.  Janetzke never personally scrolled through the cell phone, and could not remember if she was present when Sgt. O'Reilly looked at the images on the cell phone.

### (3)  Sgt. Brian O'Reilly

Sergeant Brian O'Reilly is a detective sergeant with the City of Fort Myers Police Department.  On June 4, 2012, he was notified by Gallegos that a cell phone was brought to the police department which contained inappropriate images of a pornographic nature involving children.  Sgt. O'Reilly went to the front booth where the cell phone was located, spoke with Gallegos, and received the cell

phone from Gallegos.  Gallegos told him that the cell phone had been found at a Walmart by Vo, and Widner brought the cell phone to the police department to turn it in.  Widner had left the lobby before Sgt. O'Reilly arrived, and Sgt. O'Reilly never spoke to or had contact with Widner or Vo.

Sgt. O'Reilly knew that Gallegos believed the cell phone contained child pornography.  Because he wanted to verify the images were in fact child pornography, Sgt. O'Reilly examined the images on the cell phone himself.  When he received the cell phone, he turned it on and scrolled down until he found the images.  He did not look at any other area or folder of the cell phone, and viewed the images for approximately one minute.  He observed thumbnail images as he scrolled down, and saw several images of male genitalia, briefly viewed two videos, and saw other images of children that were progressively more suggestive.  He recalled seeing three images of what he considered to be child pornography on the cell phone. Once he saw those three images, he turned the cell phone off, submitted the cell phone into evidence, and contacted the Cape Coral Police Department.  He instructed Gallegos to prepare an offense report so that he could take the report and the cell phone to the Cape Coral Police Department.  Sgt. O'Reilly did not obtain a search warrant before viewing the images on the cell phone.

Sgt. O'Reilly testified he was told that a female, not the owner of the cell phone, texted that she wanted the cell phone returned. He did not examine the texts, nor respond or send texts to this female. He had no information as to the actual owner. After viewing the images the phone contained, he would not have returned the cell phone to its owner in any event.

On June 5, 2012, O'Reilly logged the cell phone out of evidence at the Fort Myers Police Department and delivered it to the Cape Coral Police Department. He informed the Cape Coral Police Department that the cell phone had been recovered at a Walmart in Cape Coral and that it contained child pornography images. Sgt. O'Reilly provided no information as to the owner of the cell phone.

## C.   Fourth Amendment Analysis of Warrantless Viewings

### (1)   Vo and Widner Viewings

While the Fourth Amendment prohibits unreasonable searches and seizures by law enforcement officials, the Supreme Court has "consistently construed this protection as proscribing only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." United States v. Jacobsen, 466 U.S. 109, 114 (1984)(citation and internal quotation marks omitted.) "A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the

government." <u>United States v. Steiger</u>, 318 F.3d 1039, 1045 (11th Cir. 2003). It is undisputed that Vo and Widner are private persons who were not government agents or instruments in this case. Whatever they did with the cell phone in this case did not violate the Fourth Amendment, even if their searches constituted an invasion of another person's privacy. <u>Jacobsen</u>, 466 U.S. at 113; <u>United States v. Hyatt</u>, 383 F. App'x 900, 906 (11th Cir. 2010).

### (2)  Coleman, Gallegos, and Janetzke Initial Viewings

"[T]he fact that agents of the private carrier independently opened the package and made an examination that might have been impermissible for a government agent cannot render otherwise reasonable official conduct unreasonable. The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." <u>Id</u>. at 114-15. "The additional invasions of respondents' privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." <u>Id</u>. at 115, citing <u>Walter v. United States</u>, 447 U.S. 649 (1980).

Coleman testified she did not view any image on the cell phone prior to it being shown to Sgt. O'Reilly. Her conduct was reasonable, and did not violate the Fourth Amendment.

The testimony as to the initial viewings by Gallegos and Janetzke was not consistent. Both Gallegos and Janetzke testified Widner showed them hundreds of images while in the lobby of the Fort

Myers Police Department.  Widner testified he did not do so, but saw the officials viewing images while he was not with them.  While the dispute does not impact the legality of the viewings, the Court credits the testimony of Gallegos and Janetzke where it conflicts with Widner as to these events.[7]  The Court finds that Widner showed, and Gallegos and Janetzke viewed, hundred of images on the cell phone in the lobby of the Fort Myers Police Department.

These initial viewings of the cell phone images by Gallegos and Janetzke were reasonable, and did not violate the Fourth Amendment. These officials viewed no more than what Widner had already twice seen on the cell phone (once with Vo at Wal Mart and once as he looked for the pink short image to show to Coleman), and saw for a third time as he showed the images to Gallegos and Janetske.  The viewings by the police officials were not in violation of the Fourth Amendment whether Widner was operating the cell phone for them, Jacobsen, 466 U.S. at 119 ("The agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment."); Illinois v. Andreas, 463 U.S. 765, 769 n.2 (1983)("The arrival of police on the scene to confirm the presence of contraband and to determine what to do with it does not convert

---

[7]The Court does not find that Widner is not telling the truth as he remembers it, but does find that he is inaccurate as to these matters.  The Court has considered the demeanor of the witnesses, their interest in the outcome of the case, their answers to questions on direct and cross examination, as well as the factors listed in Basic Instruction 5, Eleventh Circuit Pattern Criminal Jury Instructions.

the private search by the carrier into a government search subject
to the Fourth Amendment."), or the CSAs were operating the cell
phone, Jacobsen, 466 U.S. at 120-21.  See also United States v.
Simpson, 904 F.2d 607, 610 (11th Cir. 1990); Hyatt, 383 F. App'x at
906.

### (3)  Sgt. O'Reilly Viewings

After these lobby viewings, Gallegos took the cell phone to
Sgt. O'Reilly in the front booth area and showed him some of the
images.  Sgt. O'Reilly then examined some of the images on the cell
phone himself.  Coleman, Gallagos, and Janetzke saw some images
during this process.  Widner was not personally involved in these
viewings.  The Court refers to these viewings collectively as "the
Sgt. O'Reilly viewings."

It is clear that the Sgt. O'Reilly viewings were separate from
the showings by Widner to the CSAs.  The cell phone had been given
to the police department by this time, and Widner was not personally
involved in the Sgt. O'Reilly viewings.  Nonetheless, under
Jacobsen, the Sgt. O'Reilly viewing would not invade defendants'
reasonable expectation of privacy if they did not exceed the scope
of the prior private searches.  Jacobsen, 466 U.S. at 115; United
States v. Garcia-Bercovich, 582 F.3d 1234, 1238 (11th Cir. 2009).
As with all factual matters involving a warrantless search, the
government bears the burden of proof by a preponderance of the
evidence as to both the scope of the private searches and the scope

-17-

of the subsequent searches by law enforcement.  Images seen during the Sgt. O'Reilly viewings which exceeded the scope of the private search would be inadmissible.  United States v. D'Andrea, 648 F.3d 1, 9 n.11 (1st Cir. 2011).

**(a)  Scope of Private Searches**

The government established that Vo viewed images on the cell phone.  Exactly what Vo viewed on the cell phone, however, is not established on this record.  While Vo clearly viewed some (perhaps many) images somewhere on the cell phone, and showed images to Widner, significant details of her conduct are absent from the record.  The government has not established the scope of Vo's individual conduct with the cell phone when she was apart from Widner, which  makes it impossible for the government to rely upon such conduct to establish that the Sgt. O'Reilly viewings did not exceed the scope of her prior private searches.  Therefore, Vo's conduct outside the presence of Widner is too vague to establish the scope of the private searches.

The government established the scope of the private searches largely through Widner's testimony.  Widner testified that when he was shown the cell phone by Vo at Wal Mart, he scrolled down the entirety of one photo album containing hundreds of images, looked at all of the thumbnail images, and looked at three to five full-sized images.  Widner also scrolled down the entirety of the same photo album in an attempt to find the image of the young girl in the

pink shorts, viewing each thumbnail image before handing the cell phone to CSA Coleman.  The Court found Widner's testimony in these regards to be credible.  Gallegos and Janetzke both testified that Widner scrolled down one photo album, showing them hundreds of thumbnail images and multiple full-sized images, while in the lobby of the police station.  As stated earlier, the Court credits the testimony of Gallegos and Janetzke.

Widner also testified he had not viewed a video from the cell phone, which contradicted the testimony by Gallegos that Widner showed her a video of a girl eating ice cream. The Court credits the testimony of Gallegos where it conflicts with Widner on this point.

**(b)  Scope of the Sgt. O'Reilly Viewings**

Sergeant O'Reilly observed some images in the one photo album Widner had viewed.  As to these viewings, Sgt. O'Reilly did not exceed the scope of Widner's prior viewings and therefore did not violate the Fourth Amendment.  Sgt. O'Reilly also viewed parts of two videos from the same area of the cell phone, including a girl eating ice cream and other video images.  Some of the images were literally within the scope of the private search conducted by Widner when he showed the video to Gallegos, and viewing the other video images did not exceed the scope of the private search.  United States v. Simpson, 904 F.2d 607, 610 (11th Cir. 1990)(Agents' "search of the box and videotapes did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because

they took more time and were more thorough than the Federal Express agents.")

Accordingly, the motions to suppress are denied as to all pre-search warrant viewings of the images in the cell phone by law enforcement officials.

### (4)  Retention of Cell Phone

Sgt. O'Reilly lawfully directed the retention of the cell phone.  He had probable cause to believe it contained child pornography based upon the information provided by Widner, as corroborated by the lawful viewings of the CSAs and himself, and exigent circumstances.  See e.g., United States v. Vallimont, 378 F. App'x 972, 974 (11th Cir. 2010).  Additionally, neither defendant had the right to a return of the cell phone at the time.  The images of child pornography are contraband *per se,* and a cell phone containing images of child pornography is derivative contraband. "The general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings have terminated."  Cooper v. City of Greenwood, Miss., 904 F.2d 302, 304 (5th Cir. 1990)(citation omitted).  A search warrant was ultimately obtained to examine the contents of the cell phone, the validity of which is the next issue raised by defendants.

**D.   Search Warrant Viewings of Cell Phone Content**

   **(1)   Summary of Evidence**

   Agent Patricia Enterline (Agent Enterline) is a police officer employed by the Cape Coral Police Department and is assigned to the Federal Bureau of Investigation's ("FBI") Innocent Images Task Force (Task Force).  Her first awareness of the cell phone was on June 7, 2012, when she received a telephone call from Sgt. Steve Barnes (Sgt. Barnes) while she was at the airport leaving for three weeks of various training classes.  Sgt. Barnes, the sergeant in charge of the major crimes unit for the Cape Coral Police Department, told her they had received a case that may or may not involve child pornography; that someone had found the cell phone at a Walmart in Cape Coral and turned it into the Fort Myers Police Department; that the cell phone had been delivered to the Cape Coral Police Department; that there was no urgency in pursuing an examination of the cell phone, and it was "no big deal"; and that Agent Enterline could look into it when she returned from her training.  No other agent or officer was assigned to investigate the cell phone.  While Agent Enterline is the only Cape Coral Police Department agent assigned to the FBI Task Force, there were three other Task Force officers capable of conducting such an investigation.  These three Task Force officers, however, could not check the cell phone out of the Cape Coral Police Department evidence room.  There is no

evidence that the matter could not have been investigated by other Cape Coral Police Department officers.

Agent Enterline returned from her training late Friday night, June 8, 2012, and left for another scheduled training class in Maryland on Sunday, June 10, 2012.  Agent Enterline returned from the Maryland training on June 16, 2012.  On June 18, 2012, Agent Enterline retrieved the cell phone from the Cape Coral Police Department, and transferred it to the FBI.  She also prepared another case with a federal prosecutor that day.  On June 19, 2012, Agent Enterline obtained the description and serial number of the cell phone by removing the protective case of the cell phone; she did not turn on the cell phone.  When Agent Enterline removed the cell phone's protective casing, she found three small pieces of paper between the casing and the cell phone, Government Exh. 3A-C, none of which provided information as to the owner of the cell phone.  Agent Enterline did not pursue a search warrant at this time because she was leaving the next day (June 20, 2012) for scheduled training in Boca Raton.

Agent Enterline returned to work on June 26, 2012, and had meetings with the federal prosecutor on the other case.  Also on June 26, Agent Enterline made telephone calls to try to contact the state court judge and Sgt. O'Reilly, but could not reach either person.

On June 27, 2012, Agent Enterline prepared a search warrant and affidavit for the cell phone.  She had not turned the cell phone on or examined any images, but had tried to contact the civilian witnesses by telephone, without success.  She then contacted Sgt. O'Reilly, who gave her the factual information she later put in the search warrant affidavit.  Agent Enterline testified that the search warrant application was not complicated, was relatively short, and took a couple of hours to prepare.

Agent Enterline presented the search warrant and affidavit (Gov. Exh. 1) to state Circuit Court Judge Nick Thompson, but did not have or provide any of the images to the judge.  All of the information in the Search Warrant and Affidavit had been known by the City of Fort Myers Police Department on June 4, 2012.  There was no investigation of the cell phone from June 4, 2012 until June 27, 2012, except on June 19, 2012 to obtain the serial number.  Agent Enterline believed that the probable cause to support the search warrant for the cell phone was solely based upon the information provided by Sgt. O'Reilly.  Judge Thompson signed the Search Warrant on June 27, 2012.

After obtaining the search warrant, a forensic analysis was done of the cell phone by Agent Enterline and Forensic Examiner Matt DeShazo (DeShazo).  The images discovered on the cell phone included an image that matched the description given to Agent Enterline by Sgt. O'Reilly, and images that appeared to depict a minor engaging

in sexually explicit conduct or displaying genitals.   Agent
Enterline estimated there were over one hundred images on the cell
phone.

### (2)  Validity of Search Warrant

Defendant Johnson argues that the search warrant was not lawful
because it was the product of prior unlawful warrantless searches.
(Doc. #38, p.5.)  For the reasons set forth above, the Court has
found the prior warrantless viewings were not unlawful.  Therefore,
this argument is rejected.

Defendant Sparks argues that the search warrant is defective
because the affidavit did not contain probable cause that the cell
phone contained child pornography and none of the images were given
to the issuing judge.  (Doc. #25, pp. 4-6.)  While it is factually
true that none of the images were included in the affidavit or shown
to the issuing judge, it was not legally required that this be done.
As long as the affidavit established probable cause to believe the
cell phone contained such images, the images themselves need not
have been included.  "Probable cause to support a search warrant
exists when the totality of the circumstances allow a conclusion
that there is a fair probability of finding contraband or evidence
at a particular location." United States v. Brundidge, 170 F.3d
1350, 1352 (11th Cir. 1999). A judge must "make a practical,
commonsense decision whether, given all the circumstances set forth
in the affidavit before him including the 'veracity' and 'basis of

knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). None of the information from Sgt. O'Reilly used in the search warrant application exceeded the scope of the private viewings, and the factual allegations established a fair probability that child pornography was contained in the cell phone.  The Court adopts the Report and Recommendation.  (Doc. #64, p.34.)

**(3) Delay in Obtaining Search Warrant.**

Defendants argue that even if the search warrant was based upon probable cause, the delay in obtaining it violated the Fourth Amendment.  The issue essentially is whether the delay in obtaining a search warrant for the forensic examination of the cell phone was unreasonable and infringed on defendants' possessory interests under the Fourth Amendment.

Two Eleventh Circuit cases frame the resolution of this issue: United States v. Mitchell, 565 F.3d 1347 (11th Cir. 2009) and United States v. Laist, 702 F.3d 608 (11th Cir. 2012).  Applying the same legal principles, these cases came to opposite results as to the lawfulness of a 21 day delay (unreasonable) and 25 day delay (reasonable) in obtaining a search warrant.  Other cases which have addressed the issue include: United States v. Christie, 717 F.3d 1156, 1162-64 (10th Cir. 2013)(five month delay not unlawful); United States v. Burgard, 675 F.3d 1029, 1033 (7th Cir. 2012);

United States v. Stabile, 633 F.3d 219, 235-36 (3d Cir. 2011)(three month delay reasonable); United States v. Martin, 157 F.3d 46, 54 (2d Cir. 1998); United States v. Respress, 9 F.3d 483, 488 (6th Cir. 1993); United States v. Dass, 849 F.2d 414 (9th Cir.1988).

In Mitchell, a law enforcement officer lawfully seized the hard drive of a computer without a warrant, and executed a search warrant on the hard drive 21 days later. The Court noted that while the initial seizure was lawful, even a lawful seizure could become unconstitutional because of an unreasonable infringement of a person's possessory interests "if the police act with unreasonable delay in securing a warrant." Mitchell, 565 F.3d at 1350 (citations omitted.) The reasonableness of the delay is determined in light of all the facts and circumstances and on a case-by-case basis, and must reflect a careful balancing of governmental and private interests. Mitchell, 565 F.3d at 1351 (citations and quotation marks omitted). Given the unique nature and functions of a modern computer, Mitchell found that the detention of the hard drive for 21 days without a warrant constituted a significant interference with the defendant's possessory interest. Mitchell, 565 F.3d at 1351. After examining the justifications for the delay, the Court found none were sufficient and suppressed the evidence.

In Laist, there was a 25 day delay between the lawful warrantless seizure of a computer and the execution of a search warrant on its contents. The Court again stated that a temporary

warrantless seizure supported by probable cause was reasonable as long as "the police diligently obtained a warrant in a reasonable period of time."   Laist, 702 F.3d at 613, quoting Illinois v. McArthur, 531 U.S. 326, 334 (2001).   The Court noted there was no per se rule of unreasonableness, but rather a court must "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable" after evaluating the totality of the circumstances.   Id. (citations omitted.)   Laist identified a non-exhaustive list of six highly relevant factors from past cases.   After conducting such an evaluation, the Court found a 25 day delay was reasonable under the circumstances.

The Court agrees with the Report and Recommendation that defendants retained a possessory interest in the cell phone (Doc. #64, p. 31.)   Like the computer hard drive in Mitchell and the computer in Laist, the cell phone in this case is a unique possession.   See e.g., Smallwood v. State, 113 So. 3d 724, 732 (Fla. 2013).   Agent Enterline described the cell phone as a "smart phone" which had the capability of making telephone calls, receiving and sending texts, storing documents, storing data, accessing the internet, keeping a personal calendar, taking and storing pictures with a built in camera, and performing other functions as well.   She described the cell phone as essentially a computer which could store over a thousand images.

The Court also agrees with the Report and Recommendation that defendants' possessory interest in the cell phone was diminished. (Doc. #64, pp. 31-32.)   The cell phone was not password protected.

One of the defendants had lost the cell phone, and it had been retrieved by a private person.  Two private persons and several law enforcement officials had viewed images contained in the cell phone. The cell phone had been given to the Fort Myers Police Department, whose officer confirmed the presence of child pornography in the cell phone.  From that point forward, neither defendant would have been able to retrieve the cell phone because it contained contraband and was itself derivative contraband.  Defendants replaced the cell phone within a couple of days.  Defendants' possessory interest in the cell phone was, as the Report and Recommendation found, "greatly diminished."  (Doc. #64, p. 33.)  Weighed against this are the factors discussed in Laist as to the delay.

The search warrant was obtained 23 days after the cell phone was taken into police custody.  The cell phone was seized within the meaning of the Fourth Amendment on June 4, 2012, after Sgt. O'Reilly observed some images and determined he would not return the cell phone even if the owners had appeared and requested its return.

Neither defendant consented to the detention of the cell phone or the examination of its contents.  A reasonable inference from the evidence is that one or both defendant was initially attempting to retrieve the cell phone even as it was being given to the police. There is no evidence that defendants knew the cell phone had been given to the police.

Law enforcement had a legitimate interest in holding the cell phone.  The police department was told that the cell phone contained

images of child pornography, and lawful views by law enforcement officials confirmed that information.  The cell phone was therefore contraband.

Law enforcement was not particularly diligent in pursuing its investigation of the images on the cell phone.  The case was assigned to an agent who was known to be going out of town for three weeks, and no other agent or officer was assigned to the case.  All the information known to Agent Enterline on June 26, 2012, had been known to law enforcement since June 4, 2012.  As in Mitchell, training classes are not a sufficient justification for a delay of three weeks.  The search warrant application was not complex or time-consuming.

On balance, the Court finds that the government's interests in retaining the cell phone outweighed the greatly diminished possessory interests of the defendants.  Therefore, the motions to suppress on this ground will be denied.

## E.   Subsequent Search Warrant of Johnson's Residence and Statements

Using information obtained from the forensic examination of the cell phone, Agent Enterline obtained a search warrant for a residence.  (Gov. Exh. 4).  Agent Enterline and other officers executed the search warrant of the residence later on June 27, 2012, finding both Johnson and Sparks at the residence.  The search of the residence ultimately produced some hard drives, additional cell phones, computer equipment, and small female children's clothing. Defendant Johnson also made various statements to law enforcement

officers.   Defendants seek to suppress the fruits of that search warrant and the statements mad by defendant Johnson.   The Court adopts the Report and Recommendation as to these issues, and overrules defendants' objections.

Accordingly, it is now

**ORDERED:**

1.   The Magistrate Judge's Report and Recommendation (Doc. #64) is **accepted and adopted to the extent set forth above**. Defendants' objections are **OVERRULED**.

2.   Defendant Sparks' Motion to Suppress Evidence (Doc. #25), is **DENIED**.

3.   Defendant Johnson's Motion to Suppress (Doc. #38) is **DENIED**.

4.   Defendant Johnson's Motion to Suppress Statements (Doc. #39) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this __2nd__ day of August, 2013.

_____
JOHN E. STEELE
United States District Judge


Copies:
Counsel of Record
DCCD